IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Richard Dage | : | |
| | : | Case No. C-1-04-90 |
| Plaintiff, | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| Time Warner Cable, | : | DEFENDANT'S MOTION FOR |
| | : | SUMMARY JUDGMENT ON |
| Defendant. | : | THE PLEADINGS |

This matter comes before the Court on Defendant's Motion for Summary Judgment on the Pleadings. (Doc. #15). For the reasons set forth below, Defendant's Motion is **DENIED**.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Original plaintiff Richard Dage[1] ("Dage") sued Time Warner Cable ("Time Warner"), his former employer, claiming retaliatory termination and harassment in violation of the Family Medical Leave Act ("FMLA"), 42 U.S.C. § 2601 et seq., and disability discrimination in violation of Ohio Revised Code ("O.R.C.") § 4112 and Ohio public policy. (Doc. #1). Time Warner has now moved for summary judgment on all of Dage's claims.

Time Warner hired Dage in November 1998 and terminated him nearly four years later, in September 2002. Dage's position, which at various points in his tenure bore the titles of Product Analyst and Sales and Marketing Analyst, involved the quantitative analysis of billing

---

[1] Dage passed away on January 26, 2005. Dage's counsel have indicated that Wendy Dage, Dage's wife, will be substituted as Plaintiff on the pleadings as soon as she is appointed executor of his estate. For purposes of this order, "Plaintiff" refers to Dage's estate.

1

and other company data for the Sales and Marketing Department ("Department").  Dage reported
to Sales and Marketing Vice President Dennis Holzmeier and Marketing Director Tom Dunlea.

**A.      May 2000 (Dage's first FMLA leave) through March 2002**

The events giving rise to the present dispute began in spring 2000, when Dage took the
first in a series of FMLA-authorized leaves and – according to Time Warner – also began
exhibiting the performance problems that culminated in his termination.[2]  In early May of 2000,
according to Time Warner, Holzmeier confronted Dage about mistakes in written work, gaps in
his grasp of relevant cable concepts and technical skills, and interpersonal conflicts with other
Sales and Marketing staff.  Holzmeier also documented these problems in a written warning
memorandum dated May 4, 2000.  The memorandum was apparently placed in Dage's personnel
file, but the employee acknowledgment signature line is blank.  See Dage Transcript (hereinafter
"Dage Tr."), Ex. 19.

In mid-May of 2000, Time Warner authorized Dage to take approximately six weeks of
full-time FMLA leave to help Dage cope with his clinically diagnosed depression.  Plaintiff
contends that shortly after Dage's return to work on June 23, 2000, Dage's supervisors began to
harass and discriminate against him on the basis of his depression and use of FMLA leave.  For
support, Plaintiff cites Dage's deposition testimony that Holzmeier once threatened, possibly
even prior to Dage's first FMLA leave, to terminate Dage if he "ever call[ed] in sick again."

---

[2] Plaintiff contends that Dage's supervisors were generally pleased with his work before
May 2000, noting that Dage's December 1998 probationary evaluation was positive and that
Dage received only one performance-related written warning in his first eighteen months on the
job.  (See Doc. #21 at 2-3 and Ex. 1 (December 1998 evaluation).)  Time Warner does not
address Dage's early work in its papers, but contends that Dage's "serious performance problems
began in 2000."  (See Doc. #15 at 3.)

(See Doc. #21 at 3; Dage Tr. at 45-46.)  Plaintiff also lists the following events from the period

between Dage's first and second FMLA leaves:[3]

1.      In September 2000, Holzmeier directed Dage to begin reporting to Dunlea, a less senior

        Department manager, instead of directly to Holzmeier.  Dage's job title, duties and

        compensation did not change with the shift in reporting, but Plaintiff contends that

        Holzmeier intended the reassignment to serve as a subtle demotion.  (Doc. #21 at 3).

        Time Warner responds that Dage's "performance issues" demanded closer supervision

        than Holzmeier could provide.  (Doc. #15 at 4.)¶

2.      In November 2000, Holzmeier forwarded a joke email entitled "How to Keep a Healthy

        Level of Insanity" to the Department.  See Dage Tr., Ex. 17.  The email appears to

        parody a series of mental illnesses including depression, and Plaintiff suggests Holzmeier

        intended to harass or discriminate against Dage by circulating it.

3.      In February 2001, while handing Dage his bonus check at a company function,

        Holzmeier allegedly told Dage "I ought to take you out back and punch you."  See id. at

        71.

4.      In March and April 2001, a series of written warnings and notices of verbal warnings

        were placed in Dage's personnel file.  See id. Exs. 20-23.  These warnings, like the May

        2000 memorandum, are not signed by Dage.  Moreover, Dage testified at his deposition

        that he did not recall receiving the written notices.  See id. at 112-117.  Plaintiff further

_____

        [3] Plaintiff also claims that the first performance review Dage received after returning
from his first FMLA leave, in December 2001, was markedly less positive than the review Dage
received at the end of his 60-day probationary period in December 1998.  Because Plaintiff has
provided a copy of Dage's written comments on the December 2001 review, but not the review
itself, the Court cannot verify this contention.

observes that several of the notices are missing information and that the file contains two

separate notices, both bearing Dunlea's signature and dated April 9, 2001, that appear to

document the same conduct.  (See Doc. #21 at 5;  Dage Tr. Exs. 22-23.)

4.      In July 2001, Dage had an opportunity to review blueprints for the Department's new

office space.  (Doc. #21 at 6.)  He discovered that although offices had allegedly been

provided for two coworkers at his level, no private office was provided for him.  Id.

After a several-week email exchange with Dunlea in which Dage noted that his

depression made it difficult to concentrate in public space, Dage was assigned a room

that had previously been used for storage.  Id.; Dage Tr. Ex. 16.  He moved some time

after the rest of the Department, without help from the private moving company that had

assisted the other employees.  Id. at 5-7; Dage Tr. at 55-60.  At his deposition, Dage

testified that it took several weeks to have a personal nameplate installed on the door, and

that Holzmeier took to calling him "Storage[y] Room" even after Dage made it clear that

he found the nickname offensive.  Dage Tr. at 63-66.  Dage also stated that the heating in

his office was intermittently broken and that Time Warner never successfully fixed the

problem.  Id. at 61-62.

5.      According to Plaintiff, Dage was repeatedly denied the opportunity to participate in a

leadership training program, despite the fact that certain Department employees with

shorter tenures were allowed to attend.  (Doc. #21 at 7.)

**B.      April 2002 through July 2002 (Dage's Second and Third FMLA Leaves)**

On April 1, 2002, Dage began a month of intermittent FMLA leave to help care for his

father, who had been hospitalized with cancer.  Dage Tr., Ex. 12.  Dage worked half-days during

the month of April, apparently to mitigate the impact of his leave on what Plaintiff contends was

an ever-mounting workload.  (Doc. #21 at 5, 7.)  Dage took additional intermittent FMLA leave

in July 2002, to care for his wife and new son after a difficult childbirth.  (Doc. #21 at 7.)

> **C.    August and September 2002 (Dage's Termination)**

On August 14, 2002, shortly after returning from his third FMLA leave, Dage skipped a

weekly staff meeting Holzmeier had asked him to attend.  At his deposition, Dage testified that

he was busy helping a coworker with an urgent work matter.  In any event, a minute before the

meeting was due to start, Dage sent Holzmeier an email explaining that he did not have time for

"additional routine meetings" and that Dunlea would "represent" him.  Dage Tr., Ex. 24.  Two

days later, on April 16, 2002, Dage emailed Holzmeier again to say that he had reconsidered this

position, and Holzmeier responded with an email thanking Dage.  Id.  Despite this apparent

reconciliation, Dage's personnel file contains a written warning notice, dated September 11,

2002 and signed by Tom Dunlea, concerning the meeting absence.  See id., Ex. 26.  The file

contains a second notice, also dated September 11th and signed by Dunlea, regarding an August

22, 2002 incident in which Dage violated company policy by taking home a proprietary report

and then calling in sick the next day, denying the office access to the report.  See id., Ex. 25.  At

his deposition, Dage stated that Holzmeier and Dunlea knew that he was taking the report, as he

had often done with other documents, in order to finish working over his faster home computer

connection.  Id. at 121-22.

On September 11, 2002, the same day his final two disciplinary notices were ostensibly

issued, Dage received a six-month review in which Dunlea outlined continued performance

problems and recommended that Time Warner terminate Dage's employment.  Id., Ex. 27.

Holzmeier and another supervisor approved Dunlea's recommendation shortly thereafter, and

Dage was fired. (Doc. #15 at 6.) Dage testified that Dunlea gave him a copy of his six-month

review the day it was issued, but that he did not learn about the two apparently contemporaneous

disciplinary notices until after his termination. Dage Tr. at 122-25.

### D. Procedural Background[4]

Dage sued Time Warner in this Court on February 6, 2004. In his complaint, Dage

alleged that Time Warner had subjected him to retaliatory termination and harassment in

violation of FMLA and disability discrimination in violation of O.R.C. § 4112 and Ohio public

policy. (Doc. #1.) Time Warner answered on March 3, 2004, denying liability. (Doc. #3.)

Discovery closed on December 1, 2004, and Time Warner brought the present motion for

summary judgment on February 18, 2005. (Doc. #7; Doc. # 15.)

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiff's FMLA claims pursuant to 28 U.S.C. § 1331,

and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment

is appropriate if no genuine issue of material fact exists and the moving party is entitled to

judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the

moving party has the burden of showing that there exists no genuine issue of material fact, and

the evidence, together with all inferences that can permissibly be drawn from that evidence, must

---

[4] In March 2003, before initiating his federal lawsuit, Dage filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Time Waner discriminated against him on the basis of his disability (e.g., depression) and FMLA leave history. See Dage Tr., Ex. 31. On September 18, 2003, the EEOC dismissed Dage's case.

be read in the light most favorable to the party opposing the motion.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

## III.    ANALYSIS

The first count of Dage's complaint alleged that Time Warner violated FMLA, by harassing and ultimately discharging Dage in retaliation for Dage's exercise of his FMLA leave rights.  (Doc. #1 at 3-4.)  The second and third counts alleged that Time Warner violated O.R.C. section 4112 and Ohio public policy by discriminating against Dage on the basis of his depression.  (Doc. #1 at 4-5.)  For the reasons set forth below, the Court **DENIES** Time Warner's motion for summary judgment as to all counts.

### A.    Retaliation in Violation of FMLA (Count One)

Under FMLA, a qualifying employee[5] who is unable to perform his job functions due to his or a close family member's serious health condition[6] is eligible to take up to twelve weeks of

---

[5] To qualify for FMLA benefits, an employee must have worked a minimum of twelve months for the employer from whom he is requesting leave, including a minimum of 1,250 hours in the previous twelve months.  See 29 U.S.C. § 1611(2)(A).  Time Warner concedes that Dage was eligible for FMLA leave.  (See docs. ## 1 ¶ 11, 22 and 3 ¶ 11, 22.)

[6] FMLA defines "serious health condition" as an illness, injury, impairment or physical or mental condition involving either (A) inpatient care in a hospital, hospice or residential medical care facility, or (B) continuing treatment by a health care provider.  See 29 U.S.C. § 2611(11) (2005).  While Time Warner disputes that Dage's depression constituted a "disability" for purposes of Ohio Revised Code § 4112, see part III.B., infra, it concedes that the depression qualified as a "serious health condition" for FMLA purposes.  (See docs. ## 1 ¶ 26 and 3 ¶ 26.)

annual leave without pay.   See 29 U.S.C. § 2612(a)(1).  Employees may not be discharged or "in any other way discriminat[ed]" against in retaliation for asserting their rights to FMLA leave.  29 C.F.R. § 825.220(a), (c); see also 29 U.S.C. §  2615(a)(2).  Among other prohibitions, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  29 C.F.R. § 825.220(c).

To survive summary judgment on a FMLA retaliation claim, a plaintiff must first make a prima facie showing of (1) an employee's engagement in activity protected by FMLA; (2) some adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 314 (6th Cir. 2001). With respect to causal connection, the plaintiff must show that an employee's use of FMLA leave was a "significant factor" motivating the retaliatory action.  See, e.g., Polk v. Yellow Freight System, Inc., 801 F.2d 190, 199 (6th Cir. 1986).[7]

In his complaint, Dage alleged that his Time Warner supervisors repeatedly harassed and ultimately terminated him in retaliation for his taking of FMLA leave.  (Doc. #1 at 2-4).  With respect to Plaintiff's retaliatory *termination* claim, Time Warner argues that Plaintiff has not shown the requisite "causal connection" (element 3) between Dage's use of FMLA leave and his discharge.  (Doc. #15 at 14-15.)  With respect to retaliatory *harassment*, Time Warner's opening brief argued that some of the instances of harassment alleged by Dage were not sufficiently

_____

[7] Courts evaluating FMLA retaliation claims often refer to case law under other federal statutes regulating employment discrimination.  See, e.g., Skrjanc, 272 F.3d at 315 (6th Cir. 2001) (applying, under FMLA, prima facie discrimination test first outlined in context of Title VII employment discrimination in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973)).

hostile or "adverse," and others not causally connected to Dage's FMLA leaves.  (See id. at 12-14.)  However, Plaintiff's response brief did not address the retaliatory harassment issue, and Time Warner now asserts on reply that this portion of Plaintiff's FMLA claim has been abandoned.  (See doc. #24 at 3.)

The Court considers Plaintiff's retaliatory termination and retaliatory harassment theories in turn.  For the reasons set forth below, the Court agrees with Time Warner that Plaintiff has now abandoned any claim based on a theory of retaliatory *harassment* under FMLA.  However, the Court concludes that Plaintiff has raised genuine issues of material fact as to whether Dage was *terminated* in retaliation for exercising his FMLA rights, and therefore **DENIES** summary judgment as to count one of the complaint.

### 1.     Retaliatory Termination in Violation of FMLA

### a.     Prima Facie Showing of "Causal Connection"

The prima facie evidentiary burden for demonstrating a causal connection between an employee's FMLA leave and termination is "minimal," and courts are expected to "draw reasonable inferences" from any credible evidence put forth by the plaintiff.  Nguyen v. City of Cleveland, 229 F.3d 559, 565-66 (6th Cir. 2000) (citing EEOC v. Avery Dennison, 104 F.3d 858, 861 (6th Cir. 1997)).  Causation may be inferred from indirect or circumstantial evidence, such as temporal proximity between protected leave and adverse action.  See, e.g., Skrjanc, 272 F.3d at 314.  The Sixth Circuit has, in some recent cases, suggested that temporal proximity must be coupled with some evidence of retaliatory conduct before any connection may be inferred.  See, e.g., Nguyen v. City of Cleveland, 229 F.3d 559, 566-67 (6th Cir. 2000); Parries v. Makino, No. 03-4173, 2004 WL 2940863, at *8 (6th Cir. Dec 21, 2004).  However, the Sixth Circuit has

declined to specify precisely how much additional evidence is required.  See Nguyen, 229 F.3d at 567.  Moreover, there are other recent employment retaliation cases, including FMLA cases, indicating that temporal proximity alone may support an inference of causal connection.  See, e.g., Skrjanc, 272 F.3d at 314; Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555 (6th Cir. 2004); DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004); Ford v. General Motors, 305 F.3d 545, 554-55 (6th Cir. 2002).

Dage's complaint alleged, in essence, that his termination was motivated in large part by Dage's exercise of his FMLA leave rights.  (Doc. #1 at 3-4.)  Time Warner now argues that because Dunlea did not recommend that Dage be fired until almost two months after Dage returned from the last of his three FMLA leaves, and only after Dage had violated company policy by taking home the marketing report, Plaintiff cannot establish a causal connection between the leave and the firing.  (See Doc. #15 at 15.)  Plaintiff counters that a two-month interval is narrow enough to establish an inference of causation under the "temporal proximity" theory.  (See doc. # 21 at 13-15.)  Plaintiff also argues that because Dage was routinely harassed by his superiors during the nearly two years between his first FMLA leave-taking and his firing, there is sufficient evidence of other retaliatory conduct to establish a causal connection even under the heightened standard of proof Time Warner urges.  (See doc. # 21 at 13-15.)

The Court finds that a jury could reasonably infer a "causal connection" between Dage's FMLA leave-taking and his termination.  There is recent authority for Plaintiff's proposition that a 2-month interval between protected leave and dismissal is enough to establish a causal connection.  See, e.g., Singfield, 389 F.3d at 563 (finding that 3-month interval between protected Title VII activity and discharge constituted sufficient evidence to establish a prima

facie causal connection). And even assuming *arguendo* that a "temporal proximity" showing must be supplemented by evidence of retaliatory conduct, Plaintiff has satisfied this incremental burden. For instance, the Sixth Circuit has noted that "[m]ore frequent disciplinary writeups . . . for trivial matters" may constitute evidence of retaliation. Kuka Welding, 171 F.3d at 1080. As noted in the factual background, Dage testified during his deposition that he did not remember receiving many of the warning notices in his Time Warner personnel file. However, it appears to be undisputed that virtually all the notices involve two relatively narrow bands of time: March and early April 2001, and August and September 2002. The two notices issued in April 2001 bear the same date (April 9), and appear to concern the same conduct. The two notices issued in September 2002 also bear the same date (September 11). They also concern conduct that occurred weeks earlier, in mid to late August 2002.

A jury construing these facts in the light most favorable to Plaintiff could reasonably conclude that many of these notices, particularly the September 2002 notices, involved conduct that was not serious enough to merit immediate discipline; that by summer 2002, Dage's supervisors were already inclined to fire Dage due to problems associated with his multiple FMLA leave-takings; and that the notices were issued primarily to bolster Time Warner's written "record" of Dage's poor performance in anticipation of the firing.[8] The Court recognizes that a jury could also reasonably conclude that the notices were an honest reflection of mounting concerns with Dage's performance, issued in a reasonably timely manner and in accordance with Time Warner's progressive discipline policies. However, the Court must weigh the evidence

---

[8] This same evidence of belated warnings supports a finding of pretext, as discussed at Part II.A.1.b, infra.

only to the extent necessary to determine whether Plaintiff has preserved a genuine issue for trial. Plaintiff has.

In sum, the Court finds that there is enough evidence of a "causal connection" between Dage's FMLA leaves and his termination to establish a prima facie case of employer retaliation in violation of FMLA.

### b. Non-Discriminatory Reason or Pretext

Once a plaintiff has made a prima facie showing of FMLA retaliation, the burden shifts to the defendant-employer to "articulate a legitimate, non-discriminatory reason" for the adverse employment action. See, e.g., Skrjanc, 272 F.3d at 315. If the employer comes forth with a reason, the plaintiff must counter with evidence "that the articulated reason is in reality a pretext to mask discrimination." Id. (citing McDonnell Douglas Corp v. Green, 411 U.S. 792, 804-06 (1973)). Pretext can be established by showing either that the articulated reason is "unworthy of credence," or that the employer was "more likely motivated" by discrimination. Thurman v. Yellow Freight Sys., 90 F.3d 1160, 1166 (6th Cir. 1996) (citing Texas Dept. of Comty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). Although a plaintiff cannot survive summary judgment by cursorily dismissing an employer's plausible, nondiscriminatory rationale, direct evidence of pretext is not required. See id. at 315-16 (citing Reeves v. Sanderson Plumbing, 530 U.S. 133, 147 (2000); Mitchell v. Toldeo Hosp., 964 F.2d 577, 585 (6th Cir. 1992). The Sixth Circuit has cautioned that "an employer's true motivations are particularly difficult to ascertain" in retaliation disputes, and that summary judgment is often inappropriate once an employee-plaintiff has made out a prima facie case. Singfield, 389 F.3d at 564.

Time Warner argues that even if Plaintiff has made out a prima facie case of retaliatory

FMLA termination against Dage, Plaintiff's FMLA claim must be dismissed because of the evidence suggesting that Dage was fired for sustained poor job performance. According to Time Warner, the notices in Dage's personnel file document a pattern of "serious performance problems" that dates back to early 2000, before Dage's first FMLA leave. (Doc. #15 at 3.) Time Warner maintains that it was Dage's failure to correct these problems, despite repeated warnings from his superiors, that motivated Tom Dunlea to recommend, in September 2002, that Dage be terminated. Time Warner also emphasizes that all of Dage's FMLA leave requests were granted. (Id. at 5.)

Plaintiff counters that Time Warner appeared generally satisfied with Dage's work until Dage's first FMLA leave in May 2000, and that the increase in warnings and other disciplinary measures from that time forward owed less to any material decline in Dage's job performance than with his supervisors' desire to retaliate against Dage for his FMLA leave-takings. (See generally doc. #21 at 3-8). Significantly, Plaintiff points to several specific incidents, beyond the increasingly frequent disciplinary measures, suggesting that Dage's supervisors were disposed towards retaliatory termination. Perhaps the strongest indirect evidence of retaliatory intent is Dage's deposition testimony that Dennis Holzmeier threatened, possibly prior to any of Dage's FMLA leaves, to terminate Dage for calling in sick. See Dage Tr. at 45-49. This testimony, if true, strongly suggests that Holzmeier was inclined to severely punish Dage for taking any additional leave, whatever the cause. Plaintiff also alleges that six months after Dage returned from his FMLA leave for depression, Holzmeier forwarded to Department staff a series of email jokes making light of depression. See doc. #21 at 4 and Dage Tr. Exhib. 17. This incident is not as strongly suggestive of retaliatory intent as Holzmeier's alleged threat, but a jury could

13

reasonably infer that Holzmeier did not view depression as a serious medical issue, and was thus more inclined to regard depression as a wasteful or frivolous basis for FMLA leave.  Finally, Dage testified that he did not recall receiving many of the disciplinary warnings in his personnel file, and observed that certain other warnings appeared to have been issued late or without the benefit of supporting information or supervisor signatures.  (See generally doc. #21 at 4-5, 7-8 (citing Dage Tr.).[9])  These allegations could persuade a reasonable jury that many of the warnings were in fact pretextual – designed less to document serious performance problems, and timely alert Dage to those problems, than to disguise illegitimate disciplinary motives.

The Court concludes that Plaintiff has shown enough indirect evidence to raise a genuine issue of material fact as to whether Time Warner's purported reason for terminating Dage – poor job performance – was in fact a pretext for retaliatory termination in violation of FMLA.  Taken together, and in the context of precedent cautioning against summary judgment where a case presents lingering factual questions as to employer motive, this evidence is sufficient to defeat Time Warner's motion for summary judgment on Plaintiff's retaliatory termination claim.

### 2.    Retaliatory Harassment in Violation of FMLA

Count one of Dage's complaint alleged not only that Dage was terminated for taking FMLA leaves, but also that he was "subjected to unwarranted acts of harassment and retaliation" by his supervisor and coworkers in connection with these leaves.  (Doc. #1, p. 4, ¶ 29.)  Time

---

[9]As the Court noted at Part III.A.1.a, evidence of belated warnings also supports a prima facie finding of causal connection between Dage's last FMLA leave and his termination.  Time Warner suggests on reply that Plaintiff should not be permitted to rely on common pieces of evidence to support multiple claims, or showings within claims.  (Doc. #24 at 7.)  However, Time Warner does not explain why this would be improper, so long as the evidence relates to each claim and is sufficient, with other relevant evidence, to meet the applicable burden of proof.

Warner's opening brief contends that it is entitled to judgment on both retaliation theories, but advances separate legal arguments as to each. (<u>Cf.</u> doc. #21 at 12-14 (harassment) and 14-16 (termination).) Curiously, the FMLA portion of Plaintiff's response asserts only that there remains an issue of material fact as to whether Dage was "*Terminated* In Retaliation for Taking Leave Under The FMLA." (Doc. #21 at 11, emphasis added). On reply, Time Warner argues that because Plaintiff has not disputed Time Warner's FMLA retaliatory harassment analysis, Time Warner is entitled to summary judgment on Plaintiff's harassment claim. (Doc. #24 at 3.)

The Court finds that Plaintiff has abandoned any claim to FMLA relief on a theory of retaliatory harassment by failing to address this theory in responsive briefing. <u>See, e.g.</u>, <u>Bradley v. Mary Rutan Hosp. Assoc.</u>, 322 F. Supp. 2d 926, 931 n.7 (S.D. Ohio 2004); <u>Kattar v. Three Rivers Area Hosp. Auth.</u>, 52 F. Supp.2d 789, 798 n. 7 (W.D. Mich. 1999); <u>Jones v. Allercare</u>, 203 F.R.D. 290, 307 (N.D. Ohio 2001). Plaintiff is therefore barred from relying on a retaliatory harassment theory for the remainder of this litigation. However, because Plaintiff's retaliatory harassment theory is one of two alternative bases for FMLA relief under count one of the complaint, Plaintiff's abandonment does not automatically entitle Time Warner to summary judgment on this count.

### 3.    Conclusion

Because Plaintiff has shown a genuine issue of material fact as to whether Dage was terminated in violation of FMLA, the Court **DENIES** summary judgment as to count one of Plaintiff's complaint. The Court also holds, however, that Plaintiff has abandoned any alternative theory of FMLA relief based on retaliatory harassment and may no longer rely on this theory in connection with the present lawsuit.

15

**B.**     **Disability Discrimination in Violation of O.R.C. § 4112.02(A) (Count Two)**

Plaintiff claims that Time Warner's treatment of Dage also violated O.R.C. section 4112, which prevents discrimination on the basis of disability. To survive summary judgment on his disability discrimination claim, Plaintiff must show Dage (1) was an individual with a disability; (2) was otherwise qualified to perform his job requirements; and (3) was either denied reasonable accommodation for his disability, or subjected to an adverse employment decision solely on the basis of his disability. See Brock v. United Grinding Techs., 257 F. Supp. 2d 1089, 1094 (S.D. Ohio 2003).[10] Time Warner argues that Plaintiff's section 4112 claim must be dismissed because Plaintiff has failed to make the threshold showing that Dage had a "disability" within the meaning of the statute. (Doc. #15 at 8; doc. #24 at 3-5.)

In interpreting section 4112 claims, courts may refer to the often-analogous law on employment discrimination claims under the Americans with Disabilities Act ("ADA"). See, e.g., Swanson v. University of Cincinnati, 268 F.3d 307, 314 (6th Cir. 2001). Disability status under section 4112 is determined by reference to the ADA. Brock, 257 F. Supp. 2d at 1094. The ADA defines a disabled person as one who either (1) has a physical or mental impairment that "substantially limits" one or more of his "major life activities," and (2) has a record of this impairment, or (3) does not have an impairment, but is regarded as having one. See 42 U.S.C. § 12102(2); id. Dage's complaint alleged that he was disabled under one or both of these theories;

_____

[10] The Sixth Circuit has articulated a more elaborate articulation of this test that lists employer knowledge or constructive knowledge of the disability, and maintenance of the disabled employee's position post-discharge, as separate elements. See Swanson v. University of Cincinnati, 268 F.3d 307, 314 (6th Cir. 2001). Because Time Warner's summary judgment papers contest only the initial, common element of disability status, and there does not appear to be any material dispute between the parties as to the additional elements, the Court adopts the abbreviated test for purposes of the present motion.

Time Warner contends that neither applies.  (Cf. Doc. #1 at 4, ¶ 36; Doc. #15 at 8-11.)  The Court considers each theory in turn.

### 1.    Disability Status Based on "Substantial Limitation"

Under the ADA, a substantially limiting impairment is one that either renders an individual "unable to perform a major life activity" or significantly restricts "the condition, manner or duration under which" the individual can perform that activity relative to the general population.  29 C.F.R. § 1630.2(j)(1).  Major life activities include working and sleeping.  See 29 C.F.R. § 1630.2(i) (working); Swanson, 268 F.3d at 314-17 (sleeping).  With respect to the major life activity of working, an impairment constitutes a disability only if it restricts an individual's ability "to perform either a class of jobs or a broad range of jobs in various classes" relative to an average individual of  "comparable training, skills and abilities"; "inability to perform a single, particular job" does not establish disability.  29 C.F.R. 1630.2(j)(3)(i).  In his complaint, Dage stated that he suffered from "periodic bouts with clinical depression," and was therefore disabled under Ohio law.  (Doc. #1 at 2, ¶ 12 and 4, ¶ 36.)

Time Warner acknowledges that depression may constitute a disability under the ADA when it substantially limits an individual's performance of one or more major life activities.  (See doc. #15 at 9.)  Nevertheless, Time Warner contends that Plaintiff has failed to show that *Dage's* depression was substantially limiting.  Time Warner's papers assume that work is the only major life activity relevant to this case, apparently because Dage agreed during his deposition, in response to a pointed question from defense counsel, that his basis for his disability claim was that he had major depression that affected his ability to work.  (See doc. #24 at 4 (citing Dage Tr. 132-33).)  Time Warner's opening brief on summary judgment argued that

17

Dage's depression did not constitute a substantially limiting impairment on his work, without addressing any other life activities.  (Doc. #15 at 10.)  In its response, Plaintiff appeared to concede Time Warner's argument that Dage was not sufficiently limited in his ability to work. (See Doc. #21 at 10.)  Nevertheless, Plaintiff argued that summary judgment is improper as to count two because of record evidence suggesting Dage's depression "substantially limited his ability to sleep."  (Id. at 10-11.)

On reply, Time Warner contends that it is still entitled to summary judgment on the issue of Dage's disability status because Plaintiff is legally estopped from arguing any theory of impairment not predicated on the major life activity of working.[11]  (Doc. #24 at 4.)  For support, Time Warner cites the proposition that "[i]f a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to 'bring it out at the deposition and cannot contradict her testimony in a subsequent affidavit.'"  Bradley, 322 F. Supp. 2d at 933 (internal citations omitted).  Time Warner also reproduces the following two excerpts from Dage's deposition transcript:

> Q:    Okay.  Now the impairment that you're citing as the basis for your disability is
>       major depression; is that correct?
> A:    Yes.
>
>                         *        *        *
>
> Q:    Is your claim that you have major depression and it affects your ability to work?
> A.    Yes.

_____

[11] Because disability status under the ADA and section 4112 can also be established by reference to *perceived* impairment, a showing that an individual was not substantially impaired in any major life activity would not ordinarily resolve the question of whether that individual was legally "disabled."  See 42 U.S.C. § 12102(2)(C).  Such a showing would be decisive here, however, because Plaintiff has abandoned Dage's perceived impairment claim.  See Part III.B.2, infra.

See Dage Tr. at 132-33; Doc. #24 at 4.  Time Warner adds that "[a]t no time did Dage testify that his depression substantially limited his ability to engage in any other major life activity [*sic*] other than working," and concludes that Plaintiff is therefore precluded from raising a sleeping-based argument in responsive briefing.  (Doc. #24 at 4.)

Time Warner overstates the law.  It is undisputed that no party may "create a factual issue" at summary judgment by introducing new evidence which "contradicts [that party's] earlier deposition testimony."  See, e.g., Reid v. Sears, Roebuck and Co., 790 F.2d 453, 461 (6th Cir. 1986).  Plaintiff, however, has not relied on new evidence to establish a factual "issue" as to Dage's disability status.  Plaintiff's response brief cites exhibits to the same deposition transcript Time Warner relies on its in its reply brief.  (See Doc. #21 at 10-11.)  Moreover, the Court rejects Time Warner's argument that Plaintiff necessarily "contradicted" Dage's deposition testimony by alleging that Dage's depression impaired his sleep.  At his deposition, Dage was asked a direct, narrow question about whether his depression impaired his work.  His one-word response ("yes") cannot fairly be read as an assertion that no other activities or areas of his life were impaired.

This conclusion is reinforced when the Court considers the portion of deposition testimony that appears immediately in between the two excerpts cited above:

> Q:    Okay. And just so the record is clear, you were first diagnosed as suffering from major depression in May 1999; is that correct?
> A:    Yes.
> Q:    Okay.  Now, with regard to your major depression, the law talks about how the impairment has to substantially limit a major life activity.  Now, that's the legalese.  I'm going to go through a couple of activities I think [*sic*] to confirm.  Your major depression doesn't affect your ability to walk, does it?
> A:    That's a subjective question.  I was in bed for days.
> Q:    Let me ask it a different way.

19

Dage Tr. at 132-22.  This additional text strongly suggests that defense counsel initially intended to explore the possibility that Dage's depression impaired major life activities other than working.  However, the transcript indicates that counsel never listed – let alone directly questioned Dage on – a full range of major life activities; rather, counsel focused largely on Dage's depression treatments and ability to work.  Dage, a nonlawyer with presumably limited understanding of the contours of "major life activity," cannot be faulted for failing to anticipate the significance of his sleeping problems to his disability discrimination claim.  <u>See, e.g.</u>, <u>Hall v. ITT Auto.</u>, 362 F. Supp. 2d 952, 959 n.1 (N.D. Ohio 2005).  In any event, the Court declines to retrospectively penalize Plaintiff for Time Warner's failure to exhaust this line of inquiry before discovery closed.

Because Plaintiff has raised a genuine issue of material fact as to whether Dage's alleged sleeping impairments constituted a "disability" cognizable under O.R.C. section 4112, and Time Warner has not contested Plaintiff's count two on any other basis, Time Warner's motion for summary judgment on this count is **DENIED**.

### 2.    Disability Status Based on Perceived Disability

Count two of the complaint stated that Dage had "a disability *or* Defendant perceived him as having disability."  (Doc. #1, p. 4, ¶ 36 (emphasis added).)  This phrasing suggests that Dage initially intended to argue, in the alternative, that even if his depression did not significantly restrict any "major life activities," he was nevertheless disabled for purposes of the ADA and O.R.C. § 4112 because his supervisors at Time Warner *perceived* him as restricted by his depression.  <u>See</u> 42 U.S.C. § 12102(2)(C) (defining as "disabled" any individual who "does not have an impairment, but is regarded as having one.").  Time Warner addressed this

20

alternative argument in its opening summary judgment brief. (See Doc. #15 at 11.) However, Plaintiff's response did not mention this theory or address Time Warner's arguments in opposition. (See Doc. #21 at 10-11 (discussing disability status only in the context of significant restrictions on major life activities).) For the reasons set forth in the discussion of Plaintiff's FMLA retaliatory harassment theory at Part III.A.2, supra, the Court concludes that Plaintiff has abandoned any alternative theory of relief based on perceived disability and may no longer rely on that theory in connection with this litigation.

### 3.    Conclusion

Because Plaintiff has raised a genuine issue of material fact as to whether Dage was disabled on the basis of substantial impairment in at least one major life activity (sleeping), the Court DENIES summary judgment as to count two of Plaintiff's complaint. Plaintiff, however, is precluded from arguing any alternative "perceived disability" theory by virtue of abandonment.

### C.    Breach of Ohio Public Policy (Count Three)

To state a claim for wrongful discharge in violation of Ohio public policy, a plaintiff must show (1) a clear public policy manifested in a statute, regulation or common law; (2) that discharging an employee under circumstances like those involved would jeopardize that policy; (3) that the discharge at issue was motivated by conduct related to the policy; and (4) that there was no overriding business justification for the discharge. Knox v. Neaton Auto Products Mfng., 375 F.3d 451, 460 (6th Cir. 2004) (citing Kulch v. Structural Fibers, 78 Ohio St. 3d 134, 151 (Ohio 1995)).

In count three of his complaint, Dage alleged that Time Warner's retaliatory and

discriminatory treatment violated "clear public policies expressed in both state and federal law." (Doc. #1 at 5). While count three does not specify any such policies, Time Warner concedes that O.R.C. § 4112 – the basis of Plaintiff's count two – is a "source of public policy sufficient to satisfy the first prong" of the breach test.[12] Knox, 375 F.3d at 460; see also doc. #15 at 12 ("It is undisputed that Ohio has a strong public policy against disability discrimination, as demonstrated by [O.R.C. 4112]"). Time Warner goes on to argue simply that to the extent that "Dage [has] failed to create a genuine issue of material fact that he was disabled" sufficient to overcome summary judgment on count two of the complaint, count three of the complaint must also fail. (See doc. #15 at 12 (opening brief) and doc. #24 at 5 (reply brief).)

Time Warner's argument for summary judgment on count three of Plaintiff's complaint is thus purely derivative of Time Warner's argument on count two. As Court has denied summary judgment as to count two, summary judgment must also be **DENIED** as to count three.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment on the Pleadings is **DENIED** as to all counts of Plaintiff's complaint.

IT IS SO ORDERED.

                                         ____s/Susan J. Dlott_____
                                         Susan J. Dlott
                                         United States District Judge

_____

[12] While federal law may also serve as a source of Ohio public policy, "Ohio does not recognize a cause of action for wrongful discharge in violation of the public policy embodied in the FMLA." Cavin v. Honda of Am., 346 F.3d 713, 727 (6th Cir. 2003). Therefore, the FMLA claim at count one of Plaintiff's complaint does not provide any independent basis for Plaintiff's claim in count three.